ACCEPTED
01-14-00614-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
3/18/2015 12:44:46 AM
CHRISTOPHER PRINI
CLERK

## CAUSE NUMBER 01-14-00614-CR

## IN THE COURT OF APPEALS FOR THE
### FIRST DISTRICT OF TEXAS
### AT HOUSTON

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
3/18/2015 12:44:46 AM
CHRISTOPHER A. PRINE
Clerk

| | |
|---|---|
| **JASON B. JACKSON,** | **APPELLANT** |
| **VS.** | |
| **THE STATE OF TEXAS,** | **APPELLEE** |

_____

## CAUSE NUMBER 1365982
## IN THE 176TH DISTRICT COURT
## OF HARRIS COUNTY, TEXAS

_____

## APPELLANT'S BRIEF
_____

**Windi Akins Pastorini**
Texas Bar No. 00962500
440 Louisiana, Suite 800
Houston, Texas 77002
713-236-7300
713-224-6008
windi@windipastorini.com
Attorney for Appellant

## ORAL ARGUMENT NOT REQUESTED.

## STATEMENT REGARDING ORAL ARGUMENTS

The issues in this case are such that oral arguments would not be beneficial, therefore oral arguments are not requested.

## LIST OF INTERESTED PERSONS

Jason B. Jackson — Appellant, Defendant in trial court

The Honorable Stacey W. Bond
176th District Court
Harris County, Texas — Presiding District Court Judge

Devon Anderson
Criminal District Attorney
1201 Franklin Avenue
Houston, Texas 77002 — Harris County District Attorney

Ms. Pamela Paso
Mr. Nick Social
Assistant District Attorneys
1201 Franklin, 6th Far.
Houston, Texas77002
Counsel for The State at Trial — Assistant District Attorneys

Mr. Franklin G. Bonum
Mr. Randy Martin
Assistant Public Defenders
1201 Franklin, 13th Far.
Houston, Texas 77002 — Counsel for Defendant at trial

Windi Akins Pastorini
440 Louisana, Suite 800
Houston, Texas 77002 — Attorney for Appellant on appeal

i

Bill Delmar                                              Attorney for State on appeal
Assistant District Attorney
1201 Franklin Avenue
Houston, Texas 77002
Attorney for State on appeal

# TABLE OF CONTENTS

Statement Regarding Oral Arguments................................................. *-i-*

List of Interested Persons.................................................. *-i-*

Table of Contents.................................................... *-iii-*

Index of Authorities.................................................. *-iv*

Statement of the Case...................................................... 1

Issues Presented.................................................. 2

Statement of Facts.................................................. 2

Issue Number One Restated.................................................. 10

Summary of the Argument.................................................. 11

Argument and Authorities.................................................. 11

Prayer.................................................. 17

Certificate of Service.................................................. 18

# INDEX OF AUTHORITIES

## TEXAS CASES:

*Geesa v. State*, 820 S.W.2d 154
  (Tex.Crim.App. 1991)...................................................................... 11

*O'Canas v. State*,
  140 S.W.3d 695 (Tex. App.– Dallas 2003, pet. ref'd).................. 12

*Paulson v. State*,
  28 S.W.3d 570 (Tex.Crim.App. 2000)............................................ 11

*Reyes v. State*,
  938 S.W.2d 718 (Tex.Crim.App. 1996)........................................... 11

## RULES OF APPELLATE PROCEDURE:

Rule 38.1........................................................................................... 1

**TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:**

Jason B. Jackson submits his Brief pursuant to Tex.R.App.P. 38.1 in support of his request that his case be reversed and remanded for a new trial.

## STATEMENT OF THE CASE

Jason Jackson was charged with sexually assaulting David Coronado, an adult, by anal intercourse by the use of physical force and violence on or about June 20, 2012. There was an enhancement paragraph alleging a prior conviction for possession of a controlled substance on March 17, 2006. (CR 10).

On June 27, 2014, Mr. Jackson, after being admonished by the Court, waived his right to a jury trial and elected to have a bench trial, (RR 2–17) and signed a written jury waiver. (CR 79). The trial court started hearing evidence on June 30, 2014. (RR 3–2). On July 2, 2014, the Trial Judge found Jackson guilty, found the enhancement court true, and sentenced him to 17-years in the Institutional Division of the Texas Department of Criminal Justice. (CR 78). On the same date, Jackson signed a written Notice of Appeal (CR 81) and the Trial Court signed "The Trial Courts Certification of Defendant's Right to Appeal," stating that Jackson had the right to appeal. (CR 83). A Motion for a New Trial was not filed.

## ISSUES PRESENTED

## THE TRIAL COURT ABUSED ITS DISCRETION
## BY FINDING APPELLANT GUILTY BEYOND A
## REASONABLE DOUBT.

## STATEMENT OF FACTS

In the early morning hours of June 20th, Mrs. Shirley Evans was sitting on her back patio at 6922 Pinetex Drive in Humble, Texas, visiting with a friend. (RR 3– 8, 11). As she described it, "all of a sudden someone came up to the gate hysterical, yelling, screaming 'Help me.'" (RR 3 – 11). She went over to the gate and a man was begging her to call 911 claiming that he had been raped. (RR 3 – 12). She called 911. (RR 3 – 12). When asked on cross-examination if the man was injured, she said, " it was dark. I don't know if he had any or not" then added that he did not complain about any injuries, (RR 3 – 14). She set the time as to when all this happened at 2:00 a.m. (RR 3 – 14).

Mrs. Evans's testimony was followed by the testimony of Officer Marvin Waggoner who was dispatched in response to the 911 call. (RR 3 – 15-16). As he was looking for the address, he was stopped by "an individual waving his arms, flagging me down in the driveway." (RR 3 – 17). The man said that his name was "David Coronado." (RR 3 – 17). The officer described Mr. Coronado as "very shaken, just

talking fast, kind of like broken English," that he "seemed scared, seemed nervous and a little shaken. (RR 3 – 17-18). Mr. Coronado went on to say that he had been raped. (RR 3 – 18). When asked where this happened, he pointed toward a dead end street but was not sure of which house. (RR 3 – 18). Shortly thereafter, paramedics arrived and Mr. Coronado was transported to a hospital. (RR 3 – 19). On cross-examination, Mr. Coronado said the suspect had left the scene in his car. (RR 3 – 21).

The State then called Amanda Sappington, a sexual assault nurse (SANE) at Memorial Hermann Hospital. (RR 3 – 24). She examined Mr. Coronado and the medical reports were admitted as States Exhibits 9, 10, 11 and 12, over Defense objections of hearsay and confrontation violations. (RR 3 – 27-28). Mr. Coronado told the SANE. that "After the guy Jason abused me, I escaped. His back was to me, and that's when I ran out and hid behind the house. He forced me to have oral sex, his penis in my mouth. He penetrated my anus with his penis and did not use a condom. I was screaming to let me go, but he was very strong. (RR 3 – 28).

The physical examination revealed two fresh tears on Mr. Coronado's anus. Later, she said these injuries were consistent with "an actual sexual assault," but added it was also consistent with consensual sex. (RR 3 – 3). In addition, the SANE. did took oral swabs, anal swabs, external penile swabs, saliva swabs, right nipple and left nipple swabs and fingernail swabbings on the right and left hand as well as dental

floss and some blood collection for DNA testing. (RR 3 – 30).

Gabriel Vasquez, a DA investigator for the Harris County District Attorney' Office, took buccal swabs from the Accused, Jason Jackson, (RR 3 – 55) and submitted this evidence to the Houston Police Department's crime lab. (RR 3 – 57).

India Henry, a criminalist/serologist with the Houston Forensic Science Center, (RR 3 – 59) testified that she generally screens evidence for the presence of blood and semen in sexual assault cases. (RR 3 – 60). She said the anal swabs and items identified in the record as laboratory items 1.2, 1.4., 1.5, and 1.9 were positive for semen. Ms. Henry stated that State's Exhibits 34, 35, 36, 37, 38, 39 and 40, identified in the record as DNA extract, was outsourced to Bode Technology Group for DNA testing. (RR 4 – 8). Amanda Mendoza, a forensic scientist II previously employed as DNA caseworker analyst II for Bode Technology Group in Lorton, Virginia (RR 4 – 44) preformed a DNA analysis on State's Exhibit 32 – the baccal anal swab from Jason Jackson (RR 4 – 50-51) – and determined that "the sperm fraction of the anal swab matched the DNA profile that we obtained from Jason Jackson." (RR 4 – 55).

Robert Wieners, a criminal investigator assigned to special crimes, was assigned to do the follow up investigation in this case. (RR 4 – 63-64). He developed a suspect by determining who owned the house at 6907 where the assault occurred. (RR 4 – 64-65) The owner was Jason Jackson. (RR 4 – 66). He also looked up a

picture of Jason Jackson and it matched the description of the person who owned the suspect house. (RR 4 – 67). The officer put a photo-spread together containing five people including Jason Jackson, and Coronado identified Jackson as the assailant. (RR 4 – 70). After this positive identification, Officer Wieners and his partner, Officer Jimeno, went to Jackson's residence, knocked on the door and Jackson opened the door. (RR 4 – 72).

Officer Wieners identified himself and told Jackson that he was conducting an investigation. (RR 4 – 72) There were other people present so Jackson was asked to step outside. (RR 4 – 72). They went outside to the foot of the driveway where Jackson was separated from his girlfriend inside the house. (RR 4 – 72). Officer Wieners explained that he received a report of sexual assault, and that Jackson had been identified as a potential suspect, and that DNA evidence had been found but there was not a match at the present time. (RR 4 – 72-73).

After the details of the complaint were explained, Jackson responded that "he doesn't engage in sexual activity with men and he's not a homosexual," and strongly denied being homosexual, and knowing homosexuals in that way. (RR 4 – 73). When asked if he would provide a DNA sample, Jackson said the he'd like to consult a lawyer. (RR 4 – 74). That concluded the conversation. Officer Wieners gave Jackson his contact information and told him that if he was willing to make a formal statement

in the presence of an attorney, that he would be willing to hear it. (RR 4 – 74)

The complainant, David Coronado[1] was the State's next witness. (RR 5 – 9). He testified that he met Jackson at a gay bar, J.R.'s, that he and Jackson talked for a while and Jackson invited him over to his house where they could continue talking and drinking. (RR 5 – 12-13). They left in Jackson's car and made one stop before ending up at Jackson's home. They stopped at a convenience store where Jackson bought cigarettes and some soft drinks.(RR 5 – 15). Jackson gave Coronado an opened orange drink and Coronado claimed that after drinking it, be started feeling dizzy but added this could have been the effect of his earlier drinking. (RR 5 – 15-16). When they arrived at Jackson's house, it was very dark, and Jackson explained that he had not paid the light bill. (RR 5 – 16).

Jackson took Coronado by the hand and led him to his room where he began taking off Coronado's cloths. (RR 5 – 16). Jackson began touching Coronado's penis and anus. Coronado said that he was frightened and asked him to quit, but Jackson continued and penetrated Coronado's anus with his penis. (RR 5 – 16-17). Coronado said he tried to get Jackson to stop, that Jackson was hurting him, but Jackson did not stop. Jackson put his fingers inside Coronado's anus, then got on top of Coronado and

---

[1] At trial, Coronado was going by the name of "David Ramos," but since the Court documents referred to him as "David Coronado," this name was used in the brief.

began hitting him in the face. (RR 5 – 18). While on top of Coronado, he attemted to make Coronado give him oral sex. (RR 5 – 19). Coronado said he was scared and feared that he might be killed as he was crying and saying the he wanted to leave. (RR 5 – 19).

Jackson asked Coronado if he had any money and ended up taking $60.00 from Coronado's billfold. (RR 5 – 20). Coronado pushed Jackson off him and is so doing a soft drink on the night stand spilled on the floor. While Jackson was cleaning up the floor, Jackson took some of his clothes and ran out of the house. (RR 5 – 21). Coronado hid a couple of houses away and Jackson came out of his house and left in his car. (RR 5 – 21). Thereafter, Coronado ran further down the block until he saw some lights on, heard voices where he managed to get some help.

Coronado denied that this was consensual sexual encounter even though the record reflects the following: (1) Coronado admitted going to J.R.'S, a gay bar, with another man, Donovan, who was his friend and a person whom he was currently living (RR 5 – 28); (2) this was not his first trip to the gay bar as he admitted going to J.R.'s before he was picked up by Jackson; (RR 5 – 11); (3) Coronado arrived at J.D.'s around 11:00 or 11:30 that evening, had been there for about an hour or an hour-and-one-half before Jackson – a man that he had never met – approached him, and after a 15 minute conversation left with him to go to Jackson's house (RR 5 – 11-

13, 31-32); (4) when they arrived at Jackson's house it was very dark, no lights were on, and although Coronado claimed to be frightened at this point, he made no attempt to leave (RR 5 – 15): (5) as soon as they arrived at Jackson's house, Jackson took Coronado by the hand and they walked hand-in-hand into Jackson's bedroom, and again Coronado did not protest and made no attempt to escape (RR 5 – 15, 37-38); (6) Jackson started taking off Coronado's clothes and Coronado did not resist or attempt to escape because all of his clothing was in tact and none of his garments were torn or appeared to be forcibly ripped off (RR 5 – 16, 39-41); (7) Coronado claimed that Jackson slapped him in the face two times but none of the witnesses who saw Coronado after the claimed rape, saw any injuries, bruises or marks on Coronado's face or any where else (RR 5 – 18, 41-42); (8) when Coronado was getting dressed to leave, Jackson made no attempt to stop him (RR 5 – 45-46); (9) Coronado admitted knowing he could qualify for lawful status in the States as a victim of a violent crime, such as aggravated sexual assault, and that he was attempting to get a U-Visa. (RR 5 – 48-50).

Jackson was called to the stand briefly and acknowledged that he was aware of his right to testify and it was his decision not to testify. (RR 5 – 55-56). That being said, both sides rested and closed (RR 5 – 56).

Defense Counsel, in closing arguments, contended that this was a consensual

sexual encounter and noted that the SANE examiner, Amanda Sappington, testified that the two tears on Coronado anus were was consistent with consensual sexual activity (RR 3 – 38; RR 5 – 56-57). He also noted that the condition of Coronado's clothing indicated that this was consensual sex and not a forcible sexual assault. (RR 5 – 57. Counsel argued these and other facts created a reasonable doubt and that Jackson show be acquitted, (RR 5 – 58).

The State, on the other hand, argued this was a sexual assault, relying primarily on Coronado's conduct and appearance after he left Jackson's house as attested to by the witnesses who saw him that night. The prosecutor said that the evidence indicated that Jackson "is a predator, and just like any good predator, he went looking for a hunting ground, went to the gay bar JR's and he went looking for his prey and he decided to pick a smaller male, who wasn't from this country, foreign, and that's who it was going to be he was going to prey on. And then he stalks his prey."(RR 5 – 59). After Jackson separated Coronado from "the rest of the pack," he took his prey, "he drives him far away, and once he's all alone, by himself, that's when this predator, the defendant, pounces on our complainant." (RR 5 – 60). The trial judge apparently agreed with the State and found Jackson guilty of sexual assault. (RR 5 – 60).

The punishment hearing began with the prosecutor reading the enhancement paragraph which alleged that on March 17, 2006, Jackson was convicted of

-9-

possessing a controlled substance in Cause No. 1365892 in the 248th District Court of Harris County. Jackson entered a plea of "True." (RR 6 – 5).

The State called one witness, David Coronado, who testified about the effect the sexual assault had on him. According to Coronado, he "was very afraid to trust people. I didn't want anyone to get near me whenever I went out. I had a lot of nightmares. Whenever anyone would get close to me sometimes I would jump because of being scared, and I had a lot of fear." (RR 5 – 6-7). He also claimed that his work was also impacted, "Whenever I had to go to work, sometimes I got off after dark and I w/as quite afraid to walk alone. Sometimes I had to take the bus and there were a lot of people in there and I would be very afraid sometimes, and sometimes I didn't want to go to work." (RR 6 – 7).

The Defense presented no evidence, called no witnesses, and both sides rested and closed. (RR 6 – 7). In closing remarks the Defense asked for term at the low end of the sentencing range and the State asked for 35 years, (RR 6 – 9-10). The trial judge assessed a 17-year prison term. (RR6 – 10).

**ISSUE NUMBER ONE RESTATED**

**THE TRIAL COURT ABUSED ITS DISCRETION BY FINDING APPELLANT GUILTY BEYOND A REASONABLE DOUBT.**

## SUMMARY OF THE ARGUMENT

This was what is often called a "he said, she said" case, but based upon the facts presented at trial, this was a "he said, he did not say" case. The State's allegation that Jason Jackson sexually assaulting David Coronado by use of physical force rested entirely upon Coronado's testimony that the sexual act was not consensual. David Coronado's testimony was not credible and it did not support the burden of proof required in criminal cases – proof beyond a reasonable doubt.

## ARGUMENT AND AUTHORITIES

In it common knowledge that the State must prove the allegations in their charging instrument by proof beyond a reasonable doubt. The Court of Criminal Appeals adopted a definition of reasonable doubt to be submitted in jury charges in *Geesa v. State*, 820 S.W.2d 154, 162 (Tex.Crim.App. 1991), stating that the proof must be "of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs." *Paulson v. State*, 28 S.W.3d 570, 573 (Tex.Crim.App. 2000) overruled *Geesa* in part, holding that held giving the full *Geesa* instruction was reversible error absent agreement of the parties; and *Reyes v. State*, 938 S.W.2d 718 (Tex.Crim.App. 1996), stating, "We specifically overrule that portion of *Geesa* which requires trial courts to instruct juries

on the definition of 'beyond a reasonable doubt.'" *Paulson* did not explicitly conclude that inclusion of the instruction was reversible error in the absence of an agreement to include it. *Paulson*, 28 S.W.2d at 573. *O'Canas v. State*, 140 S.W.3d 695, 699 (Tex. App.– Dallas 2003, pet. ref'd) said the "better practice is to give no definition of reasonable doubt at all to the jury."

All of these cases, however, deal with submitting the definition of reasonable doubt in the jury charge, but none of them held that the *Gessa* definition of reasonable was erroneous. They simply held that the definition should not be included in the jury instructions. There is no reason why the *Gessa* definition should not be considered when an appellate court must decide, as it must in this case, whether the State proved its case beyond a reasonable doubt in a bench trial. Assuming this to be a reasonable standard, the question before this court is: did the state present proof of such a convincing character that the court would be willing to rely and act upon it without hesitation as if would in their most important affairs?

**The Complainant's Credibility**. The story related by Coronado was implausible and most people who heard it would have some serious doubts as to it's believability and Coronado's credibility. But the standard of proof required in a criminal trial setting is much greater that the standard used in day-to-day gossip. In this setting there must be proof beyond a reasonable doubt, not a mere hunch or

-12-

suspicion.

First off, Coronado testified that he went to a gay bar, with another man, Donovan – a person who was his friend and with whom he was currently living. And this was not his first rodeo – he admitted going to J.R.'s before this night in question. His stated reason for going to J.R.'s was that he had not been in Houston very long and he was trying to meet people. (RR 5 – 9-10). His quest to "meet people" began rather late at night because they did not get to J.R.'s until sometime between 11:00 and 11.30 in the evening. (RR 5 – 11). It does not take too much imagination to figure out what a person is looking for by going to a gay bar close to midnight. And it is not for the purpose of simply "meeting people," to sooth feelings of loneliness. Men go there at that time of night to find a "hook-up"with another gay man. At that hour and at that location people are not there for friendship, they are there to search for a sexual partner. To think otherwise, one would have to have the mentality of an adoring mother explaining that her child is the only one in step in the high school marching band.

Next, Coronado claimed that Jackson – a person that he did not know and had never seen – approached him. They had about a 15-minute conversation before Coronado agreed to go home with Jackson, to talk and have some drinks, according to Coronado, because he wanted some new friends. (RR 5 – 11-13, 31-32). The

-13-

prosecutor in final arguments depicted Jackson as a "predator" and Coronado as "the prey," But this contention is as ludicrous as Coronado's stated purpose of going home with Jackson.

Everyone familiar with criminal law is familiar with the fact that sexual predators "groom" their victims but no one has ever heard of a 15-minute grooming session. It must have been a grooming session on steroids or an outright fabrication. The latter is the most obvious possibility. To think otherwise would be unreasonable.

When they arrived at Jackson's house, Coronado testified that it was very dark, and that no lights were on. According to Coronado, Jackson told him that he had failed to pay the electric bill. Coronado claimed to be frightened at this point, but he made no attempt to leave. Instead, Jackson took the "frightened" Coronado by the hand and they walked hand-in-hand into Jackson's bedroom, and again Coronado did not protest and made no attempt to escape.

What happened next was to be expected. Coronado testified that Jackson undressed him and began touching Coronado's penis and anus. Coronado said that he was frightened and asked Jackson to quit. This claim is not consistent with the events that transpired at J.R.'s and Coronado's willingness to abandon his friend and to go home with a perfect stranger after a 15-minute or so encounter. It should be obvious to anyone that Coronado went with Jackson, so they could do exactly what

Jackson was doing – getting naked and fondling before getting down to the actual sexual act. And that is what followed. Jackson penetrated Coronado's anus with his penis. Again Coronado claimed that he tried to get Jackson to stop, that Jackson was hurting him, but Jackson did not stop, he continued until he ejaculated. This was shown by the State's evidence of a DNA swab taken from the semen in Coronado's anus. Coronado also claimed that Jackson put his fingers inside his anus. This is indicative of a part of gay sex that comes after ejaculation, because, as Trial Counsel pointed out at trial, men cannot normally maintain an erection after they ejaculate.

Following all of this, Coronado claimed that Jackson got on top of his chest and that his penis was still erect. Coronado told two different stories as to what happened next. His first story was to the police and later toe the SANE nurse. He told them that Jackson made him perform oral sex. (RR 5 – 42-43) His second story came at trial where he claimed that Jackson attempted to make him perform oral and that Jackson began to slap him in the face when he refused. But one thing was consistent in both stores – that Jackson maintained an erection, and as indicated above this is highly questionable. It should also be noted that Coronado had no indication of being hit in the face as no one who saw him later that night testified as to any injuries, bruises or redness to Coronado's face.

According to Coronado, a soft drink was spilled on the floor and he managed

to get away while Jackson was leaning up the floor. Coronado, however, made no claim that Jackson tried to stop him or chase him when he dressed and left the house as one would expect if a sexual predator to do to keep a victim from reporting a forcible sexual assault to the police.

Coronado also implied throughout his testimony that Jackson had put something in his drink on the way over to Jackson's house. But he never made such a claim to the police or the SANE nurse, therefore there was no testing to determine is any such drugs were found in his system. This was a new claim made only at the time of trial and was not made or mentioned during the initial investigation.

All of this indicates that the State's primary witness was not credible or worthy of belief, and did not meet the rigorous standard of proof beyond a reasonable doubt.

**Motive.** The next question is why would Coronado claim a forcible sexual assault when his testimony indicated a consensual sexual encounter. The anser to this question is Coronado's immigration status. Coronado came to Houston from Central America and knew that he could qualify for lawful status in the States as a victim of a violent crime, such as aggravated sexual assault. He testified to such and admitted that he was attempting to get a U-Visa based upon this alleged sexual assault.

**Physical Evidence**. The only physical evidence the State presented, other than DNA evidence, was testimony that there were some small tears to Coronado's anus.

-16-

But as pointed out by Trial Counsel's cross-examination, these tears were consistent with consensual sex and well as a person having a hard stool. All of the physical evidence proved was that Coronado had anal sex – it did not prove that the sex was forcible as alleged in the State's indictment.

**Testimony from Other Witnesses:** The only evidence supporting Coronado's claim of forcible sexual assault came from a neighbor and the investigating officer. They testified that Coronado was crying and emotionally distraught. But being in this shape in the middle of the night does not equated to proof beyond a reasonable doubt that a sexual assault occurred.

It is not uncommon for couples to get into a squabble in the middle of th night and for one of them to take a hike to get away from the fray. Domestic arguments are nothing new and the fact that a person leaves the home to escape a violent argument is more common than not. Their testimony , however, does not cure or patch up Coronado's lack of credibility and when added to Coronado's testimony does not add up to proof beyond a reasonable doubt that Jackson sexually assaulted Coronado that night. The trial court therefore erred in holding that the State proved its case beyond a reasonable doubt.

## PRAYER

For the foregoing reasons, Jason Jackson requests the Court to review the

evidence in this case and thereafter reverse the case and remand it to the trial court for a new trial.

Respectfully submitted,

/s/ Windi Akins Pastorini

_____

Windi Akins Pastorini
Attorney at Law
Texas Bar No. 00962500
440 Louisiana, Suite 800
Houston, TX 77002
Tel. (713) 236-7300
Facsimile (713) 224-6008
windi@windipastorini.com
Counsel for Appellant,
Court-appointed on appeal.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Appellant's Brief was mailed to the Appellate Division of the Harris County District Attorney's office on the 18th day of March, 2015.

/s/ Windi Akins Pastorini

_____

Windi Akins Pastorini
Counsel for Appellant